# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

FILED

2006 MAR 16  A 9 31

U.S. DISTRICT COURT

TERRENCE HENDERSON,　　　　:　Case No. __303CV665 (MRK)__

VS.　　　　　　　　　　　　　:

THE TOWN OF GREENWICH　　　:


## MOTION FOR SUMMARY JUDGMENT
## "LOCAL RULE 56(a)1 STATEMENT"

1.　Plaintiff, TERRENCE HENDERSON is a citizen of The United States who presently resides at : 5360 BROADWAY, BRONX, NEW YORK.

2.　Defendant THE TOWN OF GREENWICH POLICE DEPARTMENT, a government agency located at 11 Bruce Place, Greenwich, Connecticut.

FACT I:

1.　On or about December 20, 2001, at approximately 6:20 p.m. I was illegally stopped on Greenwich Avenue, in the town of Greenwich, State of Connecticut by the Defendant, THE TOWN OF GREENWICH POLICE DEPARTMENT, it's agents, servants or employees.

(Page 4, Line 4 -7)

**DEFENDANT: A. My name is Gary Honulik. My business address is 11 BrucePlace, Greenwich, Connecticut. And I'm a police lieutenant with the GREENWICH POLICE DEPARTMENT.**

(Page 5, Line 5-12)

**DEFENDANT: A. I am the Shift Commander of a particular shift and my tour of duty. I have a rotating shift and I have a particular squad that I work with. I am in charge of depending on the shift capacity of the day, two or three sergeants, and approximately 15 to 20 patrol officers that go out and**

patrol. I am in charge of everything that takes place during the course of that shift.

(Page 5, Line 13-16)

**ATTORNEY:** Q. Now, on December 20th of the year 2001, were you employed in the same capacity, Shift Lieutenant in the Greenwich Police Department and the Shift Commander?

**DEFENDANT:** A. Yes sir.

(Page 21, Line 24-25 and Page 22, Line 1)

**ATTORNEY:** Q. When you say "we," that's the Greenwich Police Department?;

A. Yes, yes. Defendant identifies himself as the Greenwich Police Department. Please see the Court Transcript dated September 9, 2002 annexed hereto as Exhibit "1".

(Page 25, Line 7-10):

**THE DEFENDANT:** A. Let me make it clear: They were detained at that time. From the time that we stopped them until the time that the Polaroid was being taken, these gentlemen were detained. They were detained for investigative detention).

(Page 62, Line 1-6)

**THE COURT:** I'm very bothered, I'm very bothered by this. I agree with you the officers were gentlemen. They were not overbearing, they were not intimidating Mr. Henderson in anyway. They properly went about the police work in every, in every way that they could have, except they did it after an illegal stop. That's my concern.

Please see the Court Transcript dated September 9, 2002 annexed hereto as Exhibit "1".

2.    I arbitrarily became a suspect of the Defendant, THE TOWN OF

GREENWICH POLICE DEPARTMENT because of my race.

(Page 58, Line 17-22)

**THE COURT:** "That is a crime. Someone has called up and said, there is a crime going on. What we've got here is someone calling up and saying I don't like the look of the car or the people in the car, and really, is there anything beyond that? Is there any thing beyond I don't like the car and the look of the people in the car?" Please see the Court Transcript dated September 9, 2002 annexed hereto as Exhibit "1".

3.    A citizen's bias suspicion was accepted without any independent

evaluation by the Defendant, THE TOWN OF GREENWICH POLICE DEPARTMENT.

> (Page 61, Line 13-19, Page 63, Line 9-12)

> **THE COURT:** "This was a full stop, block the car, lights on. Three or four
> police vehicles with their lights flashing, five, six, seven, eight officers there
> at any one time. This is a major, a major investigation that's triggered by
> someone, a citizen with no history of reporting tips successfully who says
> I'm concerned that they are acting suspicious." Please see the Court
> Transcript dated September 9, 2002 annexed hereto as Exhibit "1". Also,
> please see documentation called Police Department, Green, Connecticut
> Narrative Incident Report, dated December 21, 2001 annexed hereto as
> Exhibit "2".

4.    Defendant, THE TOWN OF GREENWICH POLICE DEPARTMENT

failed to corroborate any violation of the law.

> (Page 59, Line 3-11)

> **THE COURT:** "And you might be in a different situation if the police car
> arrives and the car is still there and the police officer can corroborate, yes,
> there they are. There's two men, they are looking suspiciously over their
> shoulder, they are definitely looking at that store, maybe you've got a
> different case. But what we've got here is the car is moved and there is
> nothing that the officer can observe that is gong to corroborate anything
> other than I got the right car." Please see the Court Transcript dated
> September 9, 2002 annexed hereto as Exhibit "1".

5.    I was significantly intruded upon by detaining me, requiring me to present

my personal effects, conducting a warrant/criminal background check and requiring me to

exit my automobile so that the Defendant, THE TOWN OF GREENWICH POLICE

DEPARTMENT, it's agents, servants or employees for some discriminative and inexplicable

reason could photograph and search me without just cause which violated the 14th

amendment, equal protection clause, due process of law.

> (Page 11, Line 11-19)

> **DEFENDANT:** "Well, typically when we receive a report of suspicious
> activity, most all the time we will run a criminal history check, get some
> positive identification from an individual to see if they are wanted; it's
> called an NCIC check, see if they are wanted, and then we will continue

with something called a Triple I check, and that's a criminal history background, to see if they have been previously arrested for any sort of crime or any convictions."

(Page 25, Line 7-10)

**DEFENDANT:** Let me make it clear: They were detained at that time. From the time that we stopped them until the time that the polaroid was taken, these gentlemen were detained. They were detained for investigative detention.

(Page 62, Line 1-6)

**THE COURT:** I'm very bothered, I'm very bothered by this. I agree with you the officers were gentlemen. They were not overbearing, they were not intimidating Mr. Henderson in anyway. They properly went about the police work in every, in every way that they could have, except they did it after an illegal stop. That's my concern." Please see the Court Transcript dated September 9, 2002 annexed hereto as Exhibit "1".

**FACT II:**  Plaintiff repeats and alleges all allegations contained in paragraphs 1

through 5 above.

6.    I was subjected to being searched, seized and photographed without just

cause by the Defendant, THE TOWN OF GREENWICH POLICE DEPARTMENT, it's

agents, servants or employees which violated the 4th amendment, unreasonable search

and seizure.

(Page 21, Line 14-23)

**THE DEFENDANT:** "At that time we did go through the vehicle and we did check the trunk more thoroughly, yes. At that point we have the motor vehicle exception to search warrant requirement in effect when we have an arrest and we have the belief that there may be weapons and/or contraband in that vehicle. Above and beyond that we also have the vehicle inventoried. That has to be conducted also pursuant to the vehicle. Any time you tow a vehicle we have a policy in effect where a vehicle inventory is conducted and we go through everything in the vehicle."

(Page 25, Line 7-10)

**THE DEFENDANT:** Let me make it clear: They were detained at that time. From the time that we stopped them until the time that the polaroid was being taken, these gentlemen were detained. The were detained for investigative detention." Please see the Court Transcript dated September 9, 2002 annexed hereto as Exhibit "1".

**FACT III:** Plaintiff repeats and alleges all allegations contained in paragraphs 1 though 6 above.

7.    The Defendant, THE TOWN OF GREENWICH POLICE DEPARTMENT, it's agents, servants or employees illegally stopped, arrested, imprisoned, prosecuted and set bail in the sum of $100,000.00 without just cause.

(Page 54, Line 2-11)

**THE COURT:** "So I'm afraid that, my fear is that unfortunately there are too many stops, I don't know about whether in Greenwich but in other parts of the state and the district where persons are pulled over and detained based on information such as this and we don't see a tenth of them, we don't see a tenth of them because there is no evidence that's been found.  In order to make sure that that does not happen, I think suppression is appropriate, simply because there was not sufficient basis to detain these individuals."

(Page 62, Line 1-6)

**THE COURT:** "I'm very bothered, I'm very bothered by this.  I agree with you the officers were gentlemen.  They wee not overbearing, they were not intimidating Mr. Henderson in any way.  They property went about the police work in every, in every way that they could have, except they did it after an illegal stop.  That's my concern."  Please see the Court Transcript dated September 9, 2002 annexed hereto as Exhibit "1".

**FACT IV:** Plaintiff repeats and alleges all allegations contained in paragraphs 1 through 7 above.

8.    The Defendant, THE TOWN OF GREENWICH POLICE DEPARTMENT, it's agents, servants or employees caused me great pain and suffering by subjecting me to ten (10) months of prosecution without just cause which is malicious prosecution.

(Page 62, Line 1-6)

**THE COURT:** "I'm very bothered, I'm very bothered by this.  I agree with you the officers were gentlemen.  They were not overbearing, they were not intimidating Mr. Henderson in anyway.  They properly went about the police work in every, in every way that they could have, except they did it after an illegal stop.  That's my concern."

(Page 67, Line 15-25)

**THE COURT:** "Obviously I don't want to have Mr. Henderson detained if there is no good reason to do it, and I recognize the impact of this ruling on the potential prosecution here. It's not clear to me that release on bond is necessarily where we ought to go but obviously it's something we have to take up very quickly. I don't want Mr. Henderson spending time in detention if he's not going to be subject of prosecution here or if there isn't some other charge pending by way of detainer or otherwise that suggests that he ought to be kept detained. Please see the Court Transcript dated September 9, 2002 annexed hereto as Exhibit "1".

## REQUEST FOR RELIEF

**I request the following relief:**

1) Monetary relief in the sum of $20,000,000.00 for compensation; and
2) Monetary relief in the sum of $20,000,000.00 for punitive damages along with any and such further relief deemed by the court to be just and proper.

Respectfully yours,

*Terence Henderson*

TERENCE HENDERSON, Pro Se
5360 BROADWAY #7C
BRONX, N.Y 10463
1(646) 423-1450

6

# MEMORANDUM OF LAW

## Municipal Liability Based on an Unconstitutional Custom

Section 1983 provides that any person who, under color of any … custom or usage, of any State of Territory … subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. 42 U.S.C. 1983. In defining the parameters of the terms "custom" and "usage," the Court has instructed that:

> "Congress included customs and usages [in 1983} because of the persistent and wide-spread discriminatory practices of state officials… Although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute 'custom or usage' with the force of the law." <u>Bordanaro v. McLeod</u> 871 F.2d 1151 (1st Cir. 1989).

The fact that all the officers from the Greenwich Police Department acted in concert during the illegal stop, setting of bail, and 10 months of prosecution without probable cause provides enough proof that the policy making officials of the municipality can be said to have actual knowledge of it. The officers were therefore operating under a shared set of rules and customs. My constitutional deprivations occurred as a direct consequence of The Town of Greenwich's unconstitutional municipal custom. The custom was the moving force behind and the cause of the violation in this case. Therefore, I request judgement be granted as a matter of law

*Terence Hendore*

## CERTIFICATION

This is to certify that a copy of the foregoing has been mailed on the above-captioned date

to all counsel and pro se parties of record:

Valerie E. Maze, Esq.
Attorneys for Defendant
TOWN OF GREENWICH POLICE DEFENDANT
Greenwich Town Attorney's Office
Town Hall, P.O. Box 2540
Greenwich, CT 06836-2540


Terrence Henderson
5360 BROADWAY #7C
BRONX, N.Y 10063
1(646)423-1450

**EXHIBIT ONE**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - x
                                :
UNITED STATES OF AMERICA        :    No. 3:02CR-29(SRU)
                                :    915 Lafayette Boulevard
                                :    Bridgeport, Connecticut
        vs.                     :
                                :    September 9, 2002
TERENCE HENDERSON               :
                                :
- - - - - - - - - - - - - - x

SUPPRESSION MOTION

B E F O R E:

   THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.

A P P E A R A N C E S:

    FOR THE GOVERNMENT:

        OFFICE OF THE UNITED STATES ATTORNEY
        157 Church Street, P. O. Box 1824
        New Haven, Connecticut
        BY:  MICHAEL RUNOWICZ, AUSA

    FOR THE DEFENDANT:

        ROGER SIGAL, AFPD
        2 Whitney Avenue, Ste. 300
        New Haven, Connecticut  06510

                Susan E. Catucci, RMR
                Official Court Reporter
                915 Lafayette Boulevard
            Bridgeport, Connecticut  06604
                Tel: (203) 384-2173

1    Clerk, testified as follows:

2              THE CLERK:  Please state your name and address

3    for the record and spell your last name?

4              THE WITNESS:  My name is Gary Honulik,

5    H-O-N-U-L-I-K.  My business address is 11 Bruce Place,

6    Greenwich, Connecticut.  And I'm a police lieutenant with

7    the Greenwich Police Department.

8    DIRECT EXAMINATION

9    (BY MR. RUNOWICZ:)

10   (Q.   Lieutenant Honulik, how long have you been a police)

11   officer with the Greenwich Police Department?

12   ( A.   September 22 I will commence my 27th year.)

13   Q.   You indicated presently you are a lieutenant; how

14   long have you been a lieutenant?

15   A.   Approximately three and-a-half years.

16   Q.   What other positions or assignments have you had in

17   your 26 years with the Greenwich Police Department?

18   A.   Well, I started, I was a patrol officer.  I worked in

19   our traffic division.  I've worked as dispatcher, I've

20   work in virtually every aspect within the Town of

21   Greenwich Police Department in some capacity at one time

22   or another.

23   Q.   As patrol officer you're an individual that's out in

24   the public responding to calls or incidents or what have

25   you, is that correct?

1   A.   Yes, sir.

2   Q.   Now, your current assignment, essentially what does

3   your current assignment entail as a lieutenant in the

4   Greenwich Police Department?

5   A.   I am the shift commander of a particular shift and my

6   tour of duty, I have a rotating shift and I have a

7   particular squad that I work with.  I am in charge of,

8   depending on the shift capacity of the day, two or three

9   sergeants, and approximately 15 to 20 patrol officers that

10   go out and patrol.  I am in charge of everything that

11   takes place.  I'm responsible for everything that takes

12   place during the course of that shift.

13   Q.   Now, on December 20th of the year 2001, were you

14   employed in the same capacity, shift lieutenant in the

15   Greenwich Police Department and the shift commander?

16   A.   Yes, sir.

17   Q.   And were you working on that day?

18   A.   Yes, I was.

19   Q.   Now, the evening of December 20th, 2001, you

20   indicated you were the shift commander; what were you

21   doing and where were you during the course of your, when

22   you first took command as a shift commander on that

23   particular day?

24   A.   Well, typically we start out, it would have been the

25   four to midnight shift and I start out with a briefing of

1    almost simultaneously the criminal history check came back

2    from headquarters regarding the individuals.  I continued

3    my questioning even though we had the history coming back

4    very, very quickly.  Mr. Henderson, the driver of the

5    vehicle, told me he was there to pick up his mother at a

6    business establishment across the street, 289 Greenwich

7    Avenue.

8    Q.   Now, you indicated, you said their criminal history

9    was coming back; what do you mean by that, Lieutenant

10   Honulik?

11   A.   Well, typically when we receive a report of

12   suspicious activity, most all the time we will run a

13   criminal history check, get some positive identification

14   from an individual to see if they are wanted; it's called

15   an NCIC check, see if they are wanted, and then we will

16   continue with something called a Triple I Check, and

17   that's a criminal history background, to see if they have

18   been previously arrested for any sort of crime or any

19   convictions.

20   Q.   I'm sorry, I didn't mean to cut you off.

21   A.   That's all right.  Or the Triple I involves any

22   arrest or convictions.

23   Q.   Now, you indicated that someone, the criminal history

24   was coming back; do you recall what kind of criminal

25   history information was provided to you in that particular

1  compliance.  Anything I asked, I asked their permission to

2  do, they complied with directly.

3  Q.    And can you tell us whether or not at any time in

4  your conversation with Mr. Henderson, Mr. Henderson said

5  no to your requests and declined to do something that you

6  asked him to do?

7  A.    No, not one time.  He complied at every request,

8  Mr. Henderson and Mr. Pyles complied.

9  Q.    Now, subsequently after both Mr. Pyles and

10  Mr. Henderson were taken into custody, you indicated a

11  search was conducted and Sergeant Vesciglio found a second

12  firearm in the seat.  Was there a further search of the

13  car?

14  A.    At that time we did go through the vehicle and we did

15  check the trunk more thoroughly, yes.  At that point we

16  have the motor vehicle exception to search warrant

17  requirement in effect when we have an arrest and we have

18  the belief that there may be weapons and/or contraband in

19  that vehicle.  Above and beyond that we also have the

20  vehicle inventoried.  That has to be conducted also

21  pursuant to the vehicle.  Any time you tow a vehicle we

22  have a policy in effect where a vehicle inventory is

23  conducted and we go through everything in the vehicle.

24  Q.    When you say "we," that's the Greenwich Police

25  Department?

1    A.    Yes, yes.

2    Q.    And are you saying with respect to inventory, is then

3    a list made of all the items contained within the vehicle?

4    A.    That is correct.

5    Q.    Now, Lieutenant Honulik, let me just ask you:  With

6    relation -- did Mr. Henderson, other than indicating that

7    he was there to pick up his mother at the two locations

8    which were not, which were found where she was not

9    employed, did he give any other explanations as to why he

10   was there?

11   A.    That was all.  That was it.  He never mentioned

12   anything else to us.

13   Q.    Let me ask you, Lieutenant Honulik, you're much more

14   familiar with Greenwich than I am, you indicated earlier

15   in your testimony Greenwich Avenue is essentially a

16   southbound lane?

17   A.    There's two lanes traveling southbound.  It's a

18   one-way road in the center of downtown.

19   Q.    You have Betteridge Jewelers and then the location

20   where they were, that's farther down the one way street on

21   Greenwich Avenue?

22   A.    Yes, yes.

23   Q.    Where is Greenwich Hospital from that particular

24   location?

25   A.    Greenwich Hospital would be north of that area.  He

1    hold them?

2    A.    That is correct.

3    Q.    And by "hold them" you mean you meant to detain them?

4    A.    They were detained, they were detained.

5    Investigative detention, that's what they were.

6    Q.    But --

7    A.    Let me make it clear:  They were detained at that

8    time.  From the time that we stopped them until the time

9    that the polaroid was being taken, these gentlemen were

10   detained.  They were detained for investigative detention.

11   Q.    Why then did you state earlier that you still didn't

12   have enough to hold them?

13   A.    Well, the term "arrest" them, "hold" them.

14   Q.    You think the two are synonymous?

15   A.    When I say hold them or arrest them, I use that term

16   as being synonymous with arresting them.  I should have

17   used the term arrest them; I did not have enough to arrest

18   them.

19   Q.    Well, I'm not going to mince words or argue with what

20   you said.  I know the record is clear about what you said.

21   I'll move onto a different area.

22         You stated, it sounds to me like you were the officer

23   that was -- or, I'm sorry, the lieutenant, the police

24   officer who was primarily responsible for handling the

25   contact between Mr. Henderson or with Mr. Henderson and

1    any danger to anybody and certainly not to himself.

2              So I'm afraid that, my fear is that

3    unfortunately there are too many stops, I don't know about

4    whether in Greenwich but in other parts of the state and

5    the district where persons are pulled over and detained

6    based on information such as this and we don't see a tenth

7    of them, we don't see a tenth of them because there is no

8    evidence that's been found.  In order to make sure that

9    that doesn't happen, I think suppression is appropriate,

10   simply because there was not sufficient basis to detain

11   these individuals.

12             THE COURT:  Mr. Runowicz?

13             MR. RUNOWICZ:  Your Honor, I believe the

14   evidence is pretty clear that clearly at the time that

15   Officer Macchia saw the firearm in the front seat of the

16   car, the police conduct was appropriate and the entry into

17   the vehicle and the detaining of both weapons was

18   constitutionally proper.  No question.  Officer Macchia

19   was properly in place to make that initial observation of

20   the vehicle.  The government submits that he was.  As the

21   court is well aware, with respect to a Terry stop the

22   analysis is to view the totality of the circumstances for

23   objective, prudent, reasonably objective police officers

24   and I think the evidence reasonably clearly establishes

25   that the conduct of the officers in this case was

1    extensive period of time to examine and look and see, to

2    report.  It's not unlike, Your Honor, for example, there

3    is a case which wasn't cited in my brief but I found

4    subsequently, it's United States v. Bowl (ph), a 2nd

5    Circuit case.  A anonymous tip simply says a car is at the

6    White Castle and there is a gun in the car.  Police

7    officers drive up, see the car, a car parked in the rear

8    parking lot of White Castle, drive up, block the car so --

9    they parked their car so their car cannot move, officers

10   go out of the car, can't look in the window, open a door,

11   tell the people Get out of the car, and then when they get

12   out, they look in and see there is money and ultimately

13   they see a firearm.  2nd Circuit said that was permissible

14   police conduct.

15          THE COURT:  It's a little different, isn't it?

16          MR. RUNOWICZ:  I don't see that it is.

17          THE COURT:  That is a crime.  Someone has called

18   up and said, There is a crime going on.  What we've got

19   here is someone calling up and saying I don't like the

20   look of the car or the people in the car, and really, is

21   there anything beyond that?  Is there anything beyond I

22   don't like the car and the look of the people in the car?

23          MR. RUNOWICZ:  Well, to the extent -- in

24   conclusion I agree with the court and counsel, the

25   conclusion is, it is kind of based on the conclusion of

1 the witness, the conduct that they were engaged in, the

2 witness perceived it as casing the location.

3   THE COURT:  And you might be in a different

4 situation if the police car arrives and the car is still

5 there and the police officer can corroborate, yes, there

6 they are.  There's two men, they are looking suspiciously

7 over their shoulder, they are definitely looking at that

8 store, maybe you've got a different case.  But what we've

9 got here is the car is moved and there is nothing that the

10 officer can observe that is going to corroborate anything

11 other than I got the right car.

12   MR. RUNOWICZ:  I still feel the officer under

13 the cases has a right to approach that individual to

14 request information regarding their identity and what they

15 are doing.

16   THE COURT:  That isn't what happened here

17 though.

18   MR. RUNOWICZ:  Well, Officer Macchia stopped his

19 car, he had no other, he felt there was no other place to

20 stop but where he stopped, he put his lights on and did

21 approach the vehicle to obtain identification to ask what

22 they were about.  And at that point --

23   THE COURT:  And if it had stopped there and they

24 had left, we wouldn't be here today, but the problem is it

25 went further.  They were "detained," using the

1   this necessarily is the standard.  I think the officer has

2   a right to approach and he approached, obtain the

3   information and as he's obtaining information, there is an

4   escalation with respect to --

5           THE COURT:  When he first approached.

6           MR. RUNOWICZ:  -- what and why they were there,

7   so he was legally where he was, so when he saw the firearm

8   he could properly seize it.  That's the gist of the

9   government's position, Your Honor.

10          THE COURT:  I have no doubt that if there was a

11  proper stop, that everything else went fine.  The concern

12  I've got is the stop.  This wasn't an officer walking up

13  to a citizen and asking for an identification.  This was a

14  full stop, block the car, lights on.  Three or four police

15  vehicles with their lights flashing, five, six, seven,

16  eight officers there at any one time.  This is a major, a

17  major investigation that's triggered by someone, a citizen

18  with no history of reporting tips successfully who says

19  I'm concerned that they are acting suspicious, after which

20  they leave the scene where they are being suspicious and

21  Officer Macchia arrives.  He testifies there is nothing

22  about what he was able to observe prior to the stop that

23  would have informed him in stopping them.  He's relying

24  completely on the tip, and yet the tip is simply a

25  citizen's conclusion that somebody is acting suspiciously.

1          I'm very bothered, I'm very bothered by this.  I

2     agree with you the officers were gentlemen.  They were not

3     overbearing, they were not intimidating Mr. Henderson in

4     anyway.  They properly went about the police work in

5     every, in every way that they could have, except they did

6     it after an illegal stop.  That's my concern.

7          MR. RUNOWICZ:  I perceive that it was -- their

8     actions were reasonable and proper under the

9     circumstances, Your Honor.  The court obviously has a

10    different view of the evidence.  That's kind of -- and

11    that's the decision for the court to make.  The

12    government's position is this was, this was -- the conduct

13    of the officers from the inception of this was proper and

14    Constitutionally valid, so that's really all I can say.

15         THE COURT:  Well, I've already in effect made my

16    findings.

17         MR. RUNOWICZ:  Right.

18         THE COURT:  I'm accepting all of the testimony

19    given as essentially credible.  I don't really think

20    there's any issues of fact as to what happened here and

21    the question is really one as to law, as to what the law

22    provides.  There was a stop here.  I think as has been

23    acknowledged, there was a show of authority with the use

24    of the lights.  Certainly an objective person would

25    believe that their freedom to leave was restrained.  Even

1   Lieutenant Honulik indicated that the two gentlemen were

2   detained.  So there was a stop.  The question is was there

3   a reasonable suspicion to stop, i.e. was there a

4   reasonable suspicion that the occupants of the car either

5   had engaged or were about to engage in criminal behavior,

6   and that's where I think the case breaks down.  There has

7   to be more than an unparticularized suspicion or hunch of

8   the illegal activity.

9          Here, unfortunately we don't even have a police

10  suspicion or hunch.  We have a citizen's suspicion or

11  hunch that was accepted really without any independent

12  evaluation by the police.  They did not have the

13  opportunity to verify any of the information other than

14  that which was completely obvious to any passer-by.  There

15  was no basis to, in the information that was conveyed in

16  the tip to suggest that the tip was based upon any

17  knowledge that a crime was about to be committed.  It was

18  not from someone who had been reliable in evaluating these

19  types of incidents before, and importantly, it didn't even

20  happen at the scene of the concern of the suspicious

21  activity.  Happened a couple blocks away on a very busy

22  street in the heart of a busy shopping district.  And the

23  concern that there was going to be a crime about to be

24  committed at the Jewelers simply couldn't be corroborated

25  or refuted based upon the investigation that takes place a

1    aware, this was something discussed when he was released

2    on detention, the reason why Mr. Henderson was out on

3    detention for many, many months, was only taken back into

4    detention in -- in July.  I remember that because it

5    was -- or at the end of June -- was when I was on my

6    honeymoon, and although I didn't handle those proceedings,

7    Sarah Chambers did.  I'm advised that was actually on the

8    basis of, I believe he had done something to tamper with

9    the electronic monitoring system.  There were no reporting

10   violations and no claims Mr. Henderson was involved in any

11   kind of criminal activity.

12          THE COURT:  Well, let me suggest this.  I think

13   you need to get a motion in and ideally confer with the

14   government after the government has a chance to confirm

15   whether or not there is a detainer.  Obviously I don't

16   want to have Mr. Henderson detained if there is no good

17   reason to do it, and I recognize the impact of this ruling

18   on the potential prosecution here.  It's not clear to me

19   that release on bond is necessarily where we ought to go

20   but obviously it's something we have to take up very

21   quickly.  I don't want Mr. Henderson spending time in

22   detention if he's not going to be subject of prosecution

23   here or if there isn't some other charge pending by way of

24   detainer or otherwise that suggests he ought to be kept

25   detained.

C E R T I F I C A T E


     I, Susan E. Catucci, RMR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.


Susan E. Catucci, RMR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
Tel: (203) 384-2173

34

# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

RECEIVED
OCT 23 2002
OFFICE OF THE FEDERAL
PUBLIC DEFENDER
NEW HAVEN, CT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL No. 3:02CR29(SRU) |
| v. | : | |
| TERENCE HENDERSON | : | OCTOBER 16, 2001 |

## GOVERNMENT'S MOTION AND ORDER TO DISMISS INDICTMENT

Pursuant to Rule 48(a) of the Federal Rules of Criminal Procedure, the United States of America moves this Honorable Court to enter an order dismissing the indictment in this case.

Respectfully submitted,

JOHN A. DANAHER III
UNITED STATES ATTORNEY

BY:

MICHAEL E. RUNOWICZ
ASSISTANT UNITED STATES ATTORNEY
157 CHURCH STREET
NEW HAVEN, CONNECTICUT 06510
TELEPHONE NO. (203) 821-3700
FEDERAL BAR NO. CT08084

This motion is granted / denied, this 18th day of October, 2002.

STEFAN R. UNDERHILL
UNITED STATES DISTRICT JUDGE.

**EXHIBIT TWO**

# POLICE DEPARTMENT
## GREENWICH, CONNECTICUT

FOLLOW-UP ☐

# Narrative

| INCIDENT | | | |
|---|---|---|---|
| **INCIDENT** Weapons | **CODE** 150 | **INVESTIGATING OFFICER (Original Incident)** MACCHIA, MICHAEL | |
| **LOCATION** 289 GREENWICH AV | **APT / BLDG** | **REPORTING OFFICER (Re Supplement)** BIGGS, TIMOTHY | |
| LEITENBERGER STATEMENT | **NARRATIVE HEADING** | | **DATE OF NARRATIVE** 12/21/2001 |

U1-1U5239

12/21/01

Claudi Leitenberger appeared at the Criminal Investigation Division at Det Brown's request to give a sworn statement as to what she observed on the night of December 20th.

The statement is paraphrased below:

She related she and her boy friend, Roy Sievers, who also gave a written statement, were walking south on Greenwich Ave at approx 5:40 PM. They stopped at Tiffany's and went inside. When they left the store they walked north on Greenwich Ave on the same side of the street. As they approached the pocket park they noticed an older model Ford. It was possibly tan or gold. They walked past the car and noticed two black men sitting in the front seat. They both had dark color knit hats on and both were turned around and looking at Betteridge Jewelers. Betteridge Jewelers is on the opposite side of the street. But directly across from where they were parked. The car and the men looked out of place and caught their attention.

They continued to walk and decided the men looked suspicious and they should contact the police. Roy positioned himself so that he could see the registration plate and memorize it with out the men noticing him. After Roy memorized the plate he went into a local store and wrote it down. Roy noted it to be New York ATW5863. Roy then called the police.

When the police arrived they gave them a description of the car, the license plate and a description of the occupants. They also said that they appeared out of place and "up to no good".

Roy is a local storeowner and is always concerned and observant of suspicious looking vehicles/persons.